## SHANKLIN v. JOHNSON.

1. If a master permits his slave to retain and dispose of a portion of his earnings, he cannot afterwards reclaim them; and where the slave under such permission placed the part yielded up to him in the hands of a third person, to be invested in real estate, and a title taken in the name of such person, that the slave might have the benefit of the purchase, there is no resulting trust in favor of the master; nor would any subsequent master, in virtue of his purchase, acquire such right. But where the person who has invested the slave's money, sold the property, counted the preceeds in his presence, acknowledging it to be his, borrowed from him a part, and promised to return it, the law will consider this a promise to perform that which was previously a moral duty, and it inures to the master, though he may have purchased the slave subsequent to the investment of the money.

Writ of Error to the County Court of Mobile.

THIS was an action of assumpsit, at the suit of the defendant in error against the plaintiff. The declaration contains two counts, viz: 1. For money paid, laid out and expended. 2. For money had and received. The cause was tried upon the general issue, a verdict returned for the plaintiff for $818 21, and judgment rendered accordingly. On the trial, the defendant excepted to the ruling of the court. It was proved by a witness, introduced by the plaintiff, that the defendant and a slave of the plaintiff, named Moses, came to

the witnesses house, and asked him to count money ; whereupon he counted seven hundred dollars, when defendant remarked, that he had sold Moses' lot for that sum, that he should use a part of it to purchase his (defendant's) daughter, but would return it to Moses at some future time. The defendant was a free man of color.

Moses was once the property of Mrs. Owen, then of McGrew, and perhaps Zunts, before he was purchased by the plaintiff. The title to the lot spoken of by the witness, had been in the defendant, though purchased with money furnished by Moses, which he had saved from his industry over and above the wages which his previous owners had demanded of him. It had been purchased, and a deed made for it to Shanklin, while Moses was the slave of Mrs. Owen, but it was not sold until the plaintiff purchased him, according to the testimony adduced by the plaintiff, though perhaps the evidence offered by the defendant may show the reverse.

Neither of the previous owners of Moses make any claim to the lot, or the money for which it was sold.

The defendant's counsel prayed the court to charge the jury, that if defendant became indebted to Moses during the time he was the slave of Mrs. Owen, McGrew, or any other person than the plaintiff, for the money or property, and the payment of this debt was the subject of conversation with the first witness, the plaintiff could not recover. This charge was refused, but the court charged the jury, that if Moses was the property of the plaintiff when the defendant acknowledged the indebtedness, the plaintiff was entitled to a verdict, though the debt originated before he became the master of Moses. *Further*, if the jury believed the lot belonged to the defendant, who was indebted to Moses, and acknowledged that the proceeds of the lot were Moses', who at that time was the property of the plaintiff, the plaintiff was entitled to recover.

The jury were also instructed, that if they believed the seven hundred dollars was acknowledged by the defendant to be Moses' money, when the latter was the slave of any other person than the plaintiff, then they should find for the defendant. *Lastly :* If they believed the lot was bought by the defendant with Moses' money, before Moses became the

Shanklin v. Johnson.

plaintiff's property, the plaintiff could not recover, although it may have been sold subsequent to that event. To the refusal to charge, and the charges given, the defendant excepted, &c.

J. A. CAMPBELL, for the plaintiff in error. The master is certainly entitled to the earnings of his slave, or whatever money or property he may become possessed of. But the acknowledgement in the present case, that the defendant held the seven hundred dollars for Moses, could not inure to the plaintiff; for he was in no way connected with the consideration, nor had he an interest therein. A note or bond to a slave is void, and in itself gives no right to the master—a verbal promise certainly cannot impose a stronger obligation in law.

Although the master is entitled to the acquisitions of the slave, he must claim them in virtue of his right to the slave's labor, and not because the latter has derived them under a contract with a third person. There is no pretence that the plaintiff was interested in the contract between the defendant and Moses, (if there could have been one,) at the time it was made, or in the consideration for the defendant's promise.

J. TEST, for the defendant in error. Moses was the property of Mrs. Owen, when he placed (as it appears from the bill of exceptions) two hundred dollars in the defendant's hands, to purchase the lot from Kennedy. Mrs. O. allowed him to appropriate at pleasure his earnings, over and above the wages he paid her, and now declares that she has no claim on what he thus accumulated. There was, then, no resulting trust in her favor, or in favor of any one else to the lot, so long as the title remained in the defendant. In fact, it was the defendant's, charged with the moral obligation to pay Moses, or whoever might then be his master, the proceeds.

The case may be more succinctly stated thus : Mrs. Owen, in effect, gave Moses two hundred dollars, which she consented he might dispose of at pleasure—Moses accordingly put it

35

in the hands of the defendant, to lay it out for him—the defendant invested it in his own name, in real estate; afterwards he sold the property, counted out the purchase money in Moses' presence, and said it belonged to Moses. The legal claim to the money, at the suit of Mrs. Owen, or any intermediate owner of Moses, did not exist, until the lot was sold, and the money thus counted, &c. The acknowledgement and promise of the defendant can only inure to the individual who was Moses' master at the time it was made, and this we have seen, was the plaintiff. In Brandon's v. Huntsville Bank, 1 Stew. Rep. 320, the masters of a slave who had found money, were permitted to recover it of a person who had received it from the slave.

COLLIER, C. J.—According to the civil law, whatever a slave has at any time acquired, either by delivery, donation, stipulation, bequest, or any other means, becomes the property of the master, although he may be ignorant of it, or were adverse to the acquisition; for a slave it is said can have no property. [Cooper's Justinian, 100.]

Lord Coke, (Lib. 2, § 177,) in treating of villeinage, says, "if a villein purchase land, and alien the same to another, before the Lord enter, then the Lord cannot enter; for it shall be adjudged his folly that he did not enter when the land was in the hands of the villein; and so it is of goods. If the villein buy goods and sell, or give them to another, before the Lord seizeth them, then the Lord may not seize them."

In this country, it is said that slaves can do nothing in their own right, can hold no property, can neither buy, sell, barter or dispose of any thing, without express permission from their master or his substitute; so that every thing they can do, or possess, is, in legal contemplation, by permission of the master, and for his benefit. See Brandon's v. Huntsville Bank, 1 Stew. R. 320, and cases there cited in the arguments at the bar, and the opinions of the court.

It is abundantly shown by the evidence, that Moses was permitted to labor in Mobile, upon the payment to Mrs. Owen of stated wages, all that he could earn beyond these, he was permitted to dispose of at pleasure; while he was her

slave, he saved two hundred dollars, which the defendant invested in a lot purchased of Joshua Kennedy, and received a legal conveyance of the same to himself. All this took place some years before Mrs. Owen's ownership of Moses ceased. Whether the lot was sold by the defendant before the plaintiff became the master of Moses, does not conclusively appear—the testimony being contradictory. But it is believed to be undisputed, that when the purchase money was produced, counted, and in Moses' presence admitted to be his, by the defendant, and further, that the latter held part of it as a loan, for a specific purpose, and would repay it, then the ownership of the plaintiff had already commenced.

It is certainly competent for the master to give money to his slave, with permission to dispose of it at pleasure, and if disposed of, it cannot be reclaimed by the master. There could then be no resulting trust, consequent upon the purchase by the defendant, in favor of Mrs. O. In fact, she explicitly disavows all right to the savings of her slave.

As it respects the intermediate masters, they certainly acquired no legal or equitable right in virtue of the purchase from Mrs. O.; for if it had been competent for her to do so, she did not intend, or attempt, to impart such right. Moses was incompetent to make any contract with the defendant, by which the right to the lot inured to himself, either in equity or at law. There was then nothing more than a moral duty incumbent on the defendant, to give to him the proceeds of the lot, whether derivable for leasing or selling. This moral duty imposed a legal obligation when the defendant produced the money, counted it for Moses, acknowledging it to be his, and borrowed a part of it from him, just as much as if it had then, for the first time, been deposited in his hands. When this took place, the plaintiff was the master, and the right to the money of course inured to him.

Does not the right of the master to recover and appropriate the savings of the slave, or what may be given him by others, result from the relation between them, and does not the right cease whenever the connection is dissevered? We incline to think, that such is the law. If then the plaintiff is not entitled to the money, admitted by the defendant to be in his hands, the latter may retain it against all the rest of

the world. This would be exceedingly unjust to the slave, as we must suppose, that whatever is recovered will be appropriated to his benefit, although the law might not coerce the performance of such a duty.

The court, in the charges given and refused, did not rule the law materially different, so far as it respects the rights of the parties, from what we have laid it down. We think there is no available error, and the judgment is consequently affirmed.